1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ANGELA RIOUX,                              No.  2:18-cv-00233-AC

12                 Plaintiff,

13          v.                                   ORDER

14    ANDREW M. SAUL, Commissioner of
      Social Security,
15
                     Defendant.
16

17

18          Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

19   ("Commissioner"), denying her application for disability insurance benefits ("DIB") under

20   Title II of the Social Security Act, 42 U.S.C. §§ 401-34, and for Supplemental Security Income

21   ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383f.[1]

22          For the reasons that follow, the court will deny plaintiff's motion for summary judgment,

23   and grant the Commissioner's cross-motion for summary judgment.

24   _____

25   [1]  DIB is paid to disabled persons who have contributed to the Disability Insurance Program, and
     who suffer from a mental or physical disability.  42 U.S.C. § 423(a)(1); Bowen v. City of New
26   York, 476 U.S. 467, 470 (1986).  SSI is paid to financially needy disabled persons.  42 U.S.C.
     § 1382(a); Washington State Dept. of Social and Health Services v. Guardianship Estate of
27   Keffeler, 537 U.S. 371, 375 (2003) ("Title XVI of the Act, § 1381 et seq., is the Supplemental
     Security Income (SSI) scheme of benefits for aged, blind, or disabled individuals, including
28   children, whose income and assets fall below specified levels . . .").

                                                   1

# I. PROCEDURAL BACKGROUND

Plaintiff protectively filed for DIB and SSI on June 12, 2013. Administrative Record ("AR") 317-32.[2] The disability onset date for both applications was alleged to be June 12, 2013. AR 317, 324. The applications were disapproved initially and on reconsideration. AR 189-95, 198-203. Three hearings were held before ALJ Peter F. Belli on June 26, 2015, March 23, 2016, and July 28, 2016. AR 58-82, 83-108, 109-28 (transcripts). Plaintiff was present at all three hearings and testified at the first two. AR 60, 85, 111. Plaintiff was represented by attorney Randy Rosenblatt at each hearing. Id. Plaintiff's boyfriend Anthony John testified as a witness at the March 2016 hearing, and a Vocational Expert testified at the July 2016 hearing. AR 73-79, 119-24.

On September 26, 2016, the ALJ issued an unfavorable decision, finding plaintiff "not disabled" under Sections 216(i) and 223(d) of Title II of the Act, 42 U.S.C. §§ 416(i), 423(d), and Section 1614(a)(3)(A) of Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). AR 18-36 (decision). On December 4, 2017, the Appeals Council denied plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner of Social Security. AR 1-7 (decision).

Plaintiff filed this action on February 2, 2018. ECF No. 1; see 42 U.S.C. §§ 405(g), 1383(c)(3). The parties consented to the jurisdiction of the magistrate judge. ECF Nos. 7, 8. The parties' cross-motions for summary judgment, based upon the Administrative Record filed by the Commissioner, have been fully briefed. ECF Nos. 17 (plaintiff's summary judgment motion), 20 (Commissioner's summary judgment motion).

# II. FACTUAL BACKGROUND

Plaintiff was born in 1976, and accordingly was 36 years old on the alleged disability onset date, making her a "younger person" under the regulations. AR 34; see 20 C.F.R §§ 404.1563(c), 416.963(c) (same). Plaintiff has a high school education, and can communicate in English. Id.

////

////

---

[2] The AR is electronically filed at ECF Nos. 11.3 to 11.11 (AR 1 to 662).

III. LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld "if it is supported by substantial evidence and if the Commissioner applied the correct legal standards." Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003). "'The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . .'" Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995) (quoting 42 U.S.C. § 405(g)).

Substantial evidence is "more than a mere scintilla," but "may be less than a preponderance." Molina v. Astrue , 674 F.3d 1104, 1111 (9th Cir. 2012). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted). "While inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice." Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted).

Although this court cannot substitute its discretion for that of the Commissioner, the court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." Desrosiers v. Secretary of HHS, 846 F.2d 573, 576 (9th Cir. 1988); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985) ("The court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion; it may not affirm simply by isolating a specific quantum of supporting evidence.").

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). However, the court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007); Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) ("It was error for the district court to affirm the ALJ's credibility decision based on evidence that the ALJ did not discuss").

The court will not reverse the Commissioner's decision if it is based on harmless error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (quoting Stout v. Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006)); see also Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

## IV.  RELEVANT LAW

Disability Insurance Benefits and Supplemental Security Income are available for every eligible individual who is "disabled."  42 U.S.C. §§ 423(a)(1)(E) (DIB), 1381a (SSI).  Plaintiff is "disabled" if she is "'unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment . . . .'"  Bowen v. Yuckert, 482 U.S. 137, 140 (1987) (quoting identically worded provisions of 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)).

The Commissioner uses a five-step sequential evaluation process to determine whether an applicant is disabled and entitled to benefits.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003) (setting forth the "five-step sequential evaluation process to determine disability" under Title II and Title XVI).  The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.

20 C.F.R. §§ 404.1520(a)(4)(i), (b) and 416.920(a)(4)(i), (b).

> Step two: Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, the claimant is not disabled.

Id., §§ 404.1520(a)(4)(ii), (c) and 416.920(a)(4)(ii), (c).

> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is disabled.  If not, proceed to step four.

Id., §§ 404.1520(a)(4)(iii), (d) and 416.920(a)(4)(iii), (d).

> Step four: Does the claimant's residual functional capacity make him capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Id., §§ 404.1520(a)(4)(iv), (e), (f) and 416.920(a)(4)(iv), (e), (f).

Step five: Does the claimant have the residual functional capacity perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Id., §§ 404.1520(a)(4)(v), (g) and 416.920(a)(4)(v), (g).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  20 C.F.R. §§ 404.1512(a) ("In general, you have to prove to us that you are blind or disabled"), 416.912(a) (same); Bowen, 482 U.S. at 146 n.5.  However, "[a]t the fifth step of the sequential analysis, the burden shifts to the Commissioner to demonstrate that the claimant is not disabled and can engage in work that exists in significant numbers in the national economy."  Hill v. Astrue, 698 F.3d 1153, 1161 (9th Cir. 2012); Bowen, 482 U.S. at 146 n.5.

## V.  THE ALJ's DECISION

The ALJ made the following findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2015.

> 2. [Step 1] The claimant has not engaged in substantial gainful activity since June 12, 2013, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 *et seq.*).

> 3. [Step 2] The claimant has the following severe impairments: seizure disorder, obesity, anxiety disorder, and depression (20 CFR 404.1520(c) and 416.920(c)).

> 4. [Step 3] The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

> 5. [RFC]  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is limited to lifting, carrying, pushing, and/or pulling 20 pounds occasionally, 10 pounds frequently; sitting 8 hours out of an 8-hour day with normal breaks; standing and walking 6 hours out of an 8-hour workday with normal breaks; no climbing of ladders, ropes, or scaffolds; no working at unprotected heights; no working around unprotected hazardous machinery; no working in extreme temperatures; and frequent balancing. In addition, the claimant can receive, remember, understand, and carry out simple job instructions; occasionally receive, remember, understand, and carry out detailed and/or complex job instructions; have occasional interaction with the general public; frequently interact with coworkers and supervisors; make workplace judgments; and adjust to changes in the workplace.

5

> 6. [Step 4] The claimant is capable of performing past relevant work as a garment sorter and a general clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from June 12, 2013, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

AR 23-35.

As noted, the ALJ concluded that plaintiff was "not disabled" under Sections 216(i) and 223(d) of Title II of the Act, 42 U.S.C. §§ 416(i), 423(d), and Section 1614(a)(3)(A) of Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). AR 34-35.

## VI. ANALYSIS

Plaintiff argues that the ALJ erred by (1) finding at Step Three that plaintiff's seizures did not meet or equal the severity of Listing 11.02; (2) failing to properly credit the opinion of her treating neurologist, Dr. Tina Shih; and (3) improperly discounting plaintiff's testimony. ECF No. 17 at 13-23.

### A. The ALJ Did Not Err in His Listing 11.02 Determination

If a claimant shows that her impairment or combination of impairments meets or equals one of the conditions contained in the Listing of Impairments ("Listings"), she will be irrebuttably presumed disabled at Step Three, ending the disability inquiry. See Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant has the burden of proving that she satisfies the criteria for a listed impairment. Sullivan v. Zebley, 493 U.S. 521, 531 (1990).

#### 1. Listing 11.02 & SSR 87-6

Plaintiff contends the ALJ should have found her impairments met or equaled Listing 11.02, related to convulsive epilepsy. At the time of the ALJ's decision, this listing provided:

> 11.02 Epilepsy — convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment. With:

6

> A. Daytime episodes (loss of consciousness and convulsive seizures) or
>
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02. In addition, the introductory section provided that:

> Under 11.02 . . . , the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment. Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken. When seizures are occurring at the frequency stated in 11.02 . . . , evaluation of the severity of the impairment must include consideration of the serum drug levels.

20 C.F.R. Part 404, Subpt. P, App. 1 § 11.00A.[3]

Social Security Ruling 87-6—which was also in effect at the time of the ALJ's ruling but has since been rescinded[4]—elaborated on the method of evaluating claims of disabling epilepsy, emphasizing the need to ensure that claimants were compliant with their anticonvulsant medication before allowing their claims. In furtherance of that goal, SSR 87-6 (like Listing 11.02 itself) required review of a claimant's anticonvulsant blood levels. As relevant, SSR 87-6 provided:

> POLICY STATEMENT: As a result of a modern treatment which is widely available, only a small percentage of epileptics, who are

---

[3] The neurological disorder listings, including Listing 11.02, were revised effective September 29, 2016. See Revised Medical Criteria for Evaluating Neurological Disorders, 81 Fed. Reg. 43048 (July 1, 2016), available at 2016 WL 3551949. As relevant to plaintiff's argument here, the revised Listing 11.02 no longer requires consideration of serum drug levels. See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00H(3).

Because the ALJ decided plaintiff's claim on September 26, 2016—three days before the revisions became effective—the decision must be reviewed under the former listings. See 81 Fed. Reg. 43048 n.6 (stating that SSA will use the new Listings only "on and after their effective date" and "expect[s] that Federal courts will review the Commissioner's final decisions using the rule[s] that were in effect at the time we issued the decisions."); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 n.1 (9th Cir. 2003) (stating that the ALJ's decision was being reviewed under the Interim Final Rules which were in effect at the time of the final decision, not under the Final Rule which was then published but not yet effective).

[4] SSR 87-6 was rescinded effective March 3, 2017. See 82 Fed. Reg. 12485 (Mar. 3, 2017).

7

under appropriate treatment, are precluded from engaging in substantial gainful activity (SGA). Situations where the seizures are not under good control are usually due to the individual's noncompliance with the prescribed treatment rather than the ineffectiveness of the treatment itself. Noncompliance is usually manifested by failure to continue ongoing medical care and to take medication at the prescribed dosage and frequency. Determination of blood levels of anticonvulsive drugs may serve to indicate whether the prescribed medication is being taken.

*Evidence of Seizures Occurring Despite Treatment*

When seizures are alleged to be occurring at a disabling frequency, the following is essential to a sound determination:

1. An ongoing relationship with a treatment source is necessary. . . .

2. There must be a satisfactory description by the treating physician of the treatment regimen and response, in addition to corroboration of the nature and frequency of seizures, to permit an informed judgment on impairment severity. . . .

3. In every instance, the record of anticonvulsant blood levels is required before a claim can be allowed.

*Development Required When There is an Ongoing Treatment Relationship and the Treating Source Indicates that Frequent Seizures are Occurring*

When the treating source indicates that frequent seizures are occurring (or continuing to occur) despite anticonvulsant therapy, detailed information is necessary to establish whether the seizures are due to factors beyond the individual's control or to noncompliance with prescribed therapy. If the required information is not included in the initial report, it may be necessary to recontact the treating medical source for information on the treatment regimen and the claimant's compliance with it (e.g., whether there have been missed appointments, alcohol abuse, etc.). If satisfactory information on blood drug levels is not available in the treating physician's records, it must be obtained through a purchased examination.

*Evaluation of Low Anticonvulsant Blood Levels*

The predominant reason for low anticonvulsant blood levels is that the individual is not taking the drugs as prescribed. . . .

When reported blood drug levels are low, therefore, the information obtained from the treating physician should include an explanation as to why the levels are low and the results of any relevant diagnostic studies concerning the blood levels. . . . In all cases, however, blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance with the prescribed treatment.

> Blood drug levels reported during the regular course of treatment are usually of more probative value than evidence obtained for the purpose of disability evaluation which shows the blood drug level at one point in time. However, information concerning current blood levels should be purchased when the existing evidence does not contain blood drug levels and a favorable decision appears to be indicated.
>
> . . .

SSR 87-6, Titles II and XVI: The Role of Prescribed Treatment in the Evaluation of Epilepsy, 1987 WL 109184 (Jan. 1, 1987), rescinded Mar. 3, 2017, <u>available at</u> <u>https://www.ssa.gov/OP_Home/rulings/di/01/SSR87-06-di-01.html</u>.

   *2. The Hearings & the ALJ's Decision*

  At two of the three hearings held in reviewing this claim, the ALJ raised the issue of missing blood tests. At the first hearing on June 26, 2015, plaintiff testified that she recalled having blood tests ordered in December 2014 by her neurologist, Dr. Shih. AR 103. The ALJ stated that he could not find any lab results in the record, and requested lab results going back to 2013; plaintiff's attorney stated that he understood. AR 103-04. The ALJ cut that hearing short due to lack of lab tests and other medical records, and the hearing was continued to March 23, 2016. AR 60-61. Plaintiff's blood work was not discussed at the second hearing, but plaintiff's long-term boyfriend with whom she lives testified that plaintiff was not currently taking any medication besides prescribed medical marijuana; and that she had stopped taking the anticonvulsant medications in January or February of 2016 due to the side effects. AR 77-79. The record also contains notes from two February 2016 medical appointments reflecting that plaintiff was not taking her seizure medications. AR 630, 640. At the conclusion of the second hearing, the ALJ held the record open to receive additional records. AR 81.

  At the third and final hearing on June 28, 2016, the ALJ began by asking plaintiff's counsel to direct him to the blood tests showing whether or not plaintiff had been "therapeutic with her medications." AR 112. Counsel cited a letter (AR 642) in which Dr. Shih stated that plaintiff was compliant with her medication, and the ALJ clarified that he was looking for "the actual blood test" that the listings require. AR 113. The ALJ further acknowledged receipt of counsel's memorandum arguing that plaintiff met Listing 11.02, but reiterated his inability to find

lab tests demonstrating medication compliance. AR 114. The attorney maintained that, even without seeing a history of plaintiff's lab work, the record was sufficient based on the neurologist's affirmation that plaintiff was compliant and that she had done lab testing to prove it. AR 114, 127.

In his final decision, the ALJ concluded that plaintiff's severe seizure disorder did not meet or equal Listing 11.02.[5] AR 25. The ALJ first concluded that plaintiff did not experience the requisite frequency of grand mal seizures (more than "once a month in spite of at least 3 months of prescribed treatment," see Listing 11.02). The ALJ described plaintiff's seizure log as reflecting that she experienced grand mal seizures at least twice per month only for two two-month periods: January-February, and July-August 2014.[6] AR 25. Further, even if her seizures occurred at the Listing frequency, there were no lab results showing plaintiff's serum drug levels. Id. While Dr. Shih stated in July 2016 that plaintiff was adherent to her medication regimen, and referenced an April 25, 2016 recording of her phenytoin serum level, that lab result was not in the medical record. Id. Furthermore, even if there were a corroborating lab result in April 2016, plaintiff's admissions that she had stopped taking her prescribed anticonvulsant medications in February 2016 indicated that she would not have been compliant for three months prior to that lab collection. Id. Therefore, the ALJ concluded, the record did not support that plaintiff had grand mal seizures more than once per month despite at least three months of prescribed treatment. Id.

*3. Analysis*

The above-quoted regulations are clear that in order to meet Listing 11.02 (in claims decided before September 29, 2016), the record must contain laboratory tests documenting the claimant's blood drug levels. See Listing 11.00A ("[E]valuation of the severity of the impairment

---

[5] The ALJ also found that plaintiff's seizure condition did not meet or equal Listing 11.03 (nonconvulsive epilepsy). However, plaintiff does not assert the ALJ erred with respect to this listing.

[6] In fact, plaintiff's seizure log reflects that she experienced more than one (at least two) grand mal seizure per month for three separate three-month periods: January through March 2014; June through August 2014; and January through March 2015. AR 421-24, 426-28, 433-35. However, because the ALJ was correct to reject plaintiff's Listings claim based on the lack of supporting blood tests, the court finds this inaccuracy harmless.

must include consideration of the serum drug levels."); SSR 87-6 ("In every instance, the record of anticonvulsant blood levels is required before a claim can be allowed."). The case law is in accord. See Lewis v. Apfel, 236 F.3d 503, 513 (9th Cir. 2001) ("An ALJ cannot allow a claim under the epilepsy listing without a record of anticonvulsant blood levels."); Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002) ("[B]efore granting an application for benefits under [the analogous listing for non-convulsive epilepsy], the ALJ must have current evidence showing a therapeutic level of medication in the applicant's blood.") (citing Lewis, 236 F.3d at 513, and SSR 87–6).

In this case, it is undisputed that the record contained no laboratory blood tests showing plaintiff's anticonvulsant drug levels before the ALJ issued his decision. Plaintiff acknowledges here (as her attorney at the agency level did not) that SSR 87-6 required a record of anticonvulsant blood levels before a Listing 11.02 claim could be allowed. ECF No. 17 at 14. Plaintiff now argues, however, that the ALJ "failed to recontact Dr. Shih for additional information or purchase blood tests as directed" by SSR 87-6. Id. at 15. Plaintiff repeatedly quotes the portion of SSR 87-6 which states:

> If the required information is not included in the initial report, it may be necessary to recontact the treating medical source for information on the treatment regimen and the claimant's compliance with it. . . . If satisfactory information on blood drug levels is not available in the treating physician's records, it must be obtained through a purchased examination.

SSR 87-6 (emphases added).

The regulations do not make it perfectly clear whose burden it is to ensure that blood tests appear in the record for purposes of Listing 11.02. In circumstances somewhat distinct from plaintiff's denial, the Seventh Circuit described SSR 87–6 as "requiring ALJs to solicit further evidence upon a treating physician's ambiguous report of ongoing seizures." Steele, 290 F.3d at 941 (reversing Step Three finding of nonequivalence where the ALJ concluded that plaintiff's epileptic symptoms were controlled through medication without any evidence to show medication level at time of denial). And the undersigned is aware of only one case involving missing anticonvulsant blood levels finding ALJ error in not obtaining additional information from a

11

plaintiff's neurologist about the frequency of plaintiff's seizures and her compliance with medication. See Cardoza v. Astrue, No. 3:10-CV-1951 MRK WIG, 2012 WL 3727160, at *12 (D. Conn. Apr. 13, 2012) (remanding with instructions to obtain additional records and information from neurologist's office concerning the frequency of plaintiff's seizures, her compliance with prescribed antiepileptic treatment, and any lab reports concerning the levels of anticonvulsants in her blood).

At least two courts have simply rejected Listing 11.02 arguments based on the absence of record evidence of drug level testing, implying that it was plaintiff's burden to supply it. See Hoover v. Comm'r of Soc. Sec. Admin., No. CIV-17-242-KEW, 2018 WL 4599663, at *4 (E.D. Okla. Sept. 25, 2018) (holding that because the record did not include plaintiff's anticonvulsant blood level testing, the ALJ did not err in finding that plaintiff's impairments did not meet or equal Listing 11.02) (citing SSR 87-6); Torres v. Colvin, No. CV-13-02300-PHX-BSB, 2015 WL 1959511, at *7 (D. Ariz. Apr. 29, 2015) ("[T]he absence of drug serum levels precluded a finding that Plaintiff met Listing 11.02.") (citing Lewis, 236 F.3d at 513, Listing 11.00A, and SSR 87-6). Cf. Jenkins v. Bowen, No. 88-C-0757, 1988 WL 139442, at *3 (N.D. Ill. Dec. 22, 1988) (describing SSR 87-6 as requiring "that an individual who claims that she is disabled by an epileptic condition must prove that she is complying with a treatment regimen," and noting that "[t]he claimant must support her claim with an analysis of her anticonvulsant blood level").

In this case, the undersigned cannot fault the ALJ for the absence of plaintiff's drug level tests. At the very first hearing on plaintiff's claim, the ALJ requested these records from plaintiff, and there was no indication that plaintiff could not obtain them. At the final hearing one year later, plaintiff's counsel still had not provided the tests, apparently opting to rely instead on Dr. Shih's assurances that the testing had occurred and that plaintiff was medication compliant. Under then-existing regulations and Ninth Circuit law, such assurances were insufficient, since "[a]n ALJ cannot allow a claim under the epilepsy listing without *a record of* anticonvulsant blood levels." Lewis, 236 F.3d at 513 (emphasis added). Contrary to plaintiff's contention in this appeal, SSR 87-6 does not "direct[]" an ALJ to recontact a treating source whenever information is missing from the record. Rather, it states that "it *may be* necessary" to recontact the source.

12

SSR 87-6 (emphasis added). Neither does the SSR require the purchase of a new blood drug level test whenever such does not appear in the record. Instead, a purchased examination is only required "[i]f satisfactory information on blood drug levels *is not available in the treating physician's records*." Id. (emphasis added). There is no indication that this testing was not available in Dr. Shih's records. In fact, at several points (as noted by plaintiff's agency-level counsel) Dr. Shih explicitly referred to such testing results. AR 593, 621, 642.

While there may be circumstances in which the failure to recontact a physician for more information and to obtain blood drug level records requires reversal, the court cannot conclude that this is one of them. The court agrees with the Commissioner that the ALJ satisfied any duty to develop the record by holding three hearings and giving plaintiff repeated opportunities to submit evidence to support her claim. There was no error in finding that plaintiff's impairments did not meet or equal Listing 11.02 under the regulations existing at the time of the ALJ's decision.

B. The ALJ Properly Weighed the Opinion of Dr. Shih

Plaintiff next argues that the ALJ improperly discounted the opinion of treating physician Dr. Tina Shih. As relevant to plaintiff's argument, the ALJ determined that plaintiff was capable of light work with certain exceptions and additional limitations due to her seizure disorder and obesity. AR 27. In reaching this RFC, the ALJ relied more heavily on the opinion of State agency consultant Dr. C. Eskander than on the opinion of plaintiff's treating physician, Dr. Tina Shih. The court concludes that the ALJ did not err in assigning little weight to Dr. Shih's opinion.

*1. Principals Governing the Consideration of Medical Opinion Evidence*

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996). "Those physicians with the most significant clinical relationship with the claimant are generally entitled to more weight than those physicians with lesser relationships. As such, the ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons. Where such an opinion is contradicted, however, it may be rejected

13

for specific and legitimate reasons that are supported by substantial evidence in the record."

Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (internal citations omitted). "The general rule is that conflicts in the evidence are to be resolved by the Secretary and that his determination must be upheld when the evidence is susceptible to one or more rational interpretations." Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). However, "[i]f the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

   2. *The Relevant Medical Opinion Evidence*

In June 2013, after suffering several seizures, plaintiff began treatment with Dr. Tina Shih, a neurologist specializing in epilepsy at UCSF Epilepsy Center. AR 495-98, 587. Plaintiff had 45-minute sessions with Dr. Shih every six weeks, AR 125-26; however, the record only contains actual appointment records from one of these visits, AR 584-85. Plaintiff also continued to see her primary care physician, Dr. Dragana Vagic, at another clinic for various issues. At several visits to Dr. Vagic in August through October 2013, plaintiff was noted to be alert and oriented, sometimes anxious or agitated, but otherwise normal in her physical exams. AR 529-31, 504-06, 535-34. At the August appointment, plaintiff reported having 2-3 seizures weekly, but said that she had recently been seizure-free at the subsequent appointments. Id. In a letter dated October 2, 2013, Dr. Shih wrote to Dr. Vagic that plaintiff had switched seizure medications, was feeling "cognitively better," and had been able to resume reading and writing; however, about a month prior, plaintiff had a seizure while asleep and her post-seizure confusion lasted over 48 hours. AR 566-68.

On January 2, 2014, plaintiff had a grand mal seizure while at a Weight Watchers meeting and went to the emergency room at 6:30 pm that evening with her boyfriend. AR 513-14. The attending physician stated that by the time plaintiff arrived at the emergency room she was "completely awake and alert." AR 514. Plaintiff's physical examination was normal as to all systems. AR 513-14. The doctor noted that he talked to her and she was "feeling much, much better." AR 515. A few days later, at an appointment on January 8, Dr. Vagic noted that after the

14

Weight Watchers seizure, she arrived at the emergency room "alert" but felt "more anxious and sad," and stated that "her mood is always changed after the seizure activity." AR 527. In her physical exam, Dr. Vagic recorded that plaintiff was alert and oriented, in mild distress and appearing anxious, but with "no neurologic deficit." Id.

On initial review of plaintiff's disability application on January 27, 2014, the State agency consultant found that plaintiff had no functional limitations and needed only seizure-related precautions. AR 135-36. At the reconsideration level, on April 25, 2014, State agency consultant Dr. C. Eskander opined that plaintiff was able to lift or carry 20 pounds occasionally and 10 pounds frequently; stand for 6 hours; sit for a total of 6 hours; and required postural and environmental limitations for her seizure disorder. AR 162-66.

In an undated To Whom It May Concern letter, marked as "received" on August 19, 2014, Dr. Shih wrote that she had tried several anticonvulsant medications for plaintiff and was scheduling her for hospital admission for Video/EEG monitoring to characterize her seizures, classify her epilepsy, and determine if she is a candidate for epilepsy brain surgery. AR 587. In the letter, Dr. Shih stated, "I believe that Ms. Rioux is chronically disabled and should be awarded long term disability status." Id. Plaintiff was admitted to the hospital for her Video/EEG over August 4-7, 2014. AR 648-52. While there, she had two seizures, with one a grand mal seizure occurring the day before discharge. AR 564, 649. Her discharge physical examination reflected that she was in no apparent distress, alert and oriented, fluent and following commands, had normal nerves and motor movements, and her coordination was intact. AR 650. The next set of treatment notes in the record is from a January 2015 visit to Dr. Shih, who outlined a potential timeline for increasing or changing plaintiff's medications over the next several months. AR 582-85.

In an undated Seizures Medical Source Statement form, Dr. Shih indicated that she saw plaintiff every 3-6 months, and that the frequency of plaintiff's seizures varied from 2 seizures per week to 2-3 seizures per month. AR 591. Dr. Shih stated that it "usually takes a few minutes to recover"; that plaintiff felt confused and fatigued afterwards, sometimes with memory loss; and that plaintiff would need to rest for a "few hours but up to a day or two." AR 591-92. Dr. Shih

15

indicated that stress and exertion could precipitate plaintiff's seizures, and opined that plaintiff was incapable of even low stress work. AR 592. Dr. Shih further opined that plaintiff could stand/walk for a total of 2 hours; sit for a total of 4 hours; and lift or carry 20 pounds occasionally. AR 593. Dr. Shih estimated that plaintiff would need to take unscheduled breaks about every 2-3 hours for 15-20 minutes or longer, due to stress; and would likely miss three (possibly more) days of work per month as a result of her impairments and/or treatment. AR 594. In addition, plaintiff needed to avoid climbing, extreme temperature, heavy lifting, heavy machinery, heights, hazardous materials or fumes, and driving. Id.

In July 2015, plaintiff had a seizure while shopping and went to the emergency room where she was seen by a doctor at 6:00 that evening. AR 614. Plaintiff's physical exam reflected that she was alert and oriented, in no distress, with normal mood and affect. AR 615.

The next medical records are from an appointment with an unknown provider on February 17, 2016, whose notes indicate that plaintiff was not then taking any medication. AR 640. On February 25, 2016 at 1:30 pm, plaintiff saw another doctor, after having had a seizure that morning. AR 630. She stated that "she has been negligent in taking her medications as directed and as a result of that her seizure threshold has apparently been lowered," but she requested pain medication to help with the secondary effects of the seizure, such as muscle soreness. Id. Her physical exam was normal, reflecting that she was active, alert, in no distress, with appropriate affect. Id.

In March 2016, during a seizure at home, plaintiff fell and hit her head. AR 632. She arrived at the emergency room 30 or 40 minutes later to treat her bruising and shoulder pain. Id. Her physical exam reflected that she was generally alert, in no acute distress; had no "focal neurological deficit"; and was cooperative with appropriate mood and affect. Id.

In July 2016, Dr. Shih wrote another To Whom It May Concern letter describing plaintiff's typical seizures, which she stated occur about 1-3 times per month. AR 642. After seizures, plaintiff suffers "incapacitating headaches" for 48-72 hours; "significant cognitive impairment" lasting 48-72 hours; and post-seizure depression. Id. Due to the frequency of the seizures and severity of the post-seizure symptoms, plaintiff would be unable to work for at least

16

4 days a month.  Id.  Dr. Shih also stated that plaintiff was adherent to the medication regimen, that a "phenytoin serum level" was recorded on April 25, 2016, and that she was repeating the serum level that month.  Id.

### 3. The ALJ's Decision

The ALJ gave great weight to the reconsideration-level opinion of non-examining State agency consultant Dr. Eskander.  AR 30.  The ALJ acknowledged that opinions of non-examining medical sources are generally entitled to less weight than those of treating sources; but he noted that consideration of multiple factors could dictate otherwise in a particular case.  AR 30-31.  The ALJ reasoned that in this case, Dr. Eskander's opinion was consistent with the normal physical examination findings throughout the record and included seizure precautions warranted for plaintiff's documented seizure disorder.  AR 31.

Conversely, the ALJ gave little weight to Dr. Shih's opinions, finding them to be "an overestimation of the claimant's limitations."  AR 31.  The ALJ reasoned that, first, Dr. Shih's opinions were inadequately supported by clinical findings.  Id.  Although the video EEG confirmed that plaintiff has a seizure disorder, the ALJ noted that Dr. Shih appeared to base her opinion on plaintiff's subjective complaints of post-ictal phenomena and her self-reports of compliance with prescribed seizure medication.  Id.  However, plaintiff's reports of slow recovery after seizures were not supported by treatment provider notes, and there were no blood serum levels to confirm medication compliance.  Id.  Second, the ALJ stated that he gave little weight to Dr. Shih's opinion that plaintiff is disabled and not able to work because this opinion on an issue reserved to the Commissioner was not entitled to controlling weight and would not be given special significance.  AR 32.

### 4. Analysis

Although the opinions of Drs. Eskander and Shih overlapped in many respects as to plaintiff's functional limitations, Dr. Shih's opinion that plaintiff could not perform even low-stress work, would need numerous breaks, and would be absent more than 4 days per month was contradicted by Dr. Eskander's opinion.  Because Dr. Shih was a treating physician and Dr. Eskander a non-examining physician, the ALJ was required to provide specific, legitimate

17

reasons for discounting Dr. Shih's opinion.  <u>See</u> <u>Orn</u>, 495 F.3d at 632.  The undersigned concludes that the ALJ did so.

First, the ALJ determined that Dr. Shih's opinion was unsupported by clinical findings in the record.  This alone is sufficient.  <u>See</u> <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008) (explaining that an "incongruity" between a treating physician's questionnaire responses and a patient's medical records is a "specific and legitimate reason" for discounting the physician's opinions).  Although Dr. Shih has had an extended, personal treating relationship with plaintiff, the record contains no objective or clinical findings from plaintiff's sessions with her. Other than a handful of notations by Dr. Vagic that plaintiff appeared anxious at certain appointments in 2013 and 2014 (AR 527, 531, 534), there is no clinical evidence supporting the extreme no-stress limitations to which Dr. Shih opined.

In addition, Dr. Shih's opinion that plaintiff would likely miss at least 4 days of work per month due to her seizures and the sometimes several-day recovery period is inconsistent with the normal physical examination findings reflected on each of plaintiff's four post-seizure trips to the clinic or the ER.  In January 2014 and July 2015, plaintiff went to the ER the same day that she suffered the respective seizures in public.  Although it is not clear exactly how much time passed between these seizures and the physical exams, in both cases she was "completely awake," alert and oriented, within a matter of hours—not days.  AR 514-15, 615.  The same is true of plaintiff's February 2016 doctor's appointment following a seizure that morning.  AR 630.  And in her March 2016 ER visit, she was found alert, in no distress, and cooperative, after having arrived at most 40 minutes after her seizure.  AR 632.

Despite plaintiff's protestation that Dr. Shih's limitations were not based solely on plaintiff's subjective complaints and self-reports, the undersigned can find no other evidence of record substantiating them.  As will be discussed in the following section, plaintiff's statements regarding the severity of her limitations were properly discounted.  Therefore, the lack of alternate record support for Dr. Shih's limitations was an independent ground for discounting her opinions.  <u>See</u> <u>Tommasetti</u>, 533 F.3d at 1041 ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as

incredible." (citation omitted)); <u>Fair v. Bowen</u>, 885 F.2d 597, 605 (9th Cir. 1989) (holding that a treating physician's reliance on a patient's own discredited subjective complaints is a specific and legitimate reason for discounting the physician's opinion).

Plaintiff also takes issue with the ALJ's additional statement that he was giving little weight to Dr. Shih's opinion that plaintiff is disabled and should be awarded long term disability status, arguing that the ALJ was still required to consider that opinion. ECF No. 17 at 18. As far as the court can tell, the ALJ did exactly that by acknowledging Dr. Shih's opinion on this point and identifying the weight given to it. As an opinion regarding the ultimate disability determination, this opinion was not entitled to any special weight. 20 C.F.R. 416.927(e); <u>see</u> <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148-49 (9th Cir. 2001) (noting that an ALJ is not bound by the opinion of a treating physician with respect to the ultimate determination of disability). The ALJ's assessment of this opinion was valid.

Because the ALJ gave at least one specific and legitimate reasons for discounting the opinions of Dr. Shih, there was no error in assigning those opinions little weight.

C. <u>The ALJ Properly Considered Plaintiff's Subjective Testimony</u>

Finally, plaintiff argues that the ALJ improperly discredited her testimony regarding the severity of her seizure condition and her functional limitations.

*1. Principles Governing the Consideration of Subjective Testimony*

Evaluating the credibility of a plaintiff's subjective testimony is a two-step process: First, the ALJ must "determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. . . . In this analysis, the claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." <u>Garrison v. Colvin</u>, 759 F.3d 995, 1014 (9th Cir. 2014) (internal citations omitted). Objective medical evidence of the pain or fatigue itself is not required. <u>Id.</u> (internal citations omitted). Second, if the ALJ does not find evidence of malingering, the ALJ may only reject the claimant's testimony by offering "specific, clear and convincing reasons for doing so." <u>Id.</u> (internal citations omitted). While an

ALJ's credibility finding must be properly supported and sufficiently specific to ensure a reviewing court the ALJ did not "arbitrarily discredit" a claimant's subjective statements, an ALJ is also not "required to believe every allegation" of disability. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). So long as substantial evidence supports an ALJ's credibility finding, a court "may not engage in second-guessing." Thomas, 278 F.3d at 958.

### 2. Relevant Hearing Testimony

Over the course of the first two hearings, plaintiff testified in relevant part as follows. She lived in an apartment with her boyfriend, Tony, who generally drove her where she needed to go since she could not drive with her seizure condition and was no longer biking after having a seizure while bicycling in 2013. AR 90, 95-97. She sometimes rode the bus; she was able to cook, do laundry, make beds, and dress and bathe herself. AR 97, 100-01. She tried to read every day; she did puzzles, and watched TV. She was organizing her house to make things more accessible while recovering from seizures and had done internet research on seizure medication. AR 67-68. She left her last job in 2013 after taking medical leave due to her seizures because she wasn't "returning fully in [her] cognitive abilities." AR 68-69. She had been experiencing grand mal seizures at least every 14 days since 2013. AR 70. The seizures generally lasted about two minutes and often involved urinary incontinence. AR 71. Her post-seizure symptoms varied, but often her muscles would cramp up, and it usually took her 15 to 20 minutes to get up. AR 71-72. The amount of time for her "mental facilities" to return varied "anywhere from days to even a couple of weeks." AR 72. Generally, it would take her a week to get back to her normal routine. AR 72. She did not feel she could hold down a full time job because her seizures made her a liability and "cause[d] problems with [her] thinking greatly." AR 73.

### 3. The ALJ's Decision

In his final decision, the ALJ noted that, contrary to plaintiff's testimony, her seizure log showed several months during which she experienced no seizures or only one seizure in 2014 and 2015. AR 28. The ALJ recounted plaintiff's seizure treatment and medication history. AR 28-29. The ALJ found that, although the record supported that plaintiff had a seizure disorder, her allegation that she could not resume activities for up to three weeks after a seizure was not

supported by the record. AR 29-30. Specifically, the ALJ noted two of the above-described medical appointments on the same day as a preceding seizure when plaintiff was observed to be active, alert, cooperative, and able to communicate with the provider. AR 30. Further, the ALJ found plaintiff's allegation that "her cognitive abilities are not returning to normal due to seizures" was also unsupported by the record. AR 30. The ALJ reasoned that no treating or examining physician had documented the plaintiff exhibited permanent diminished cognitive function. Id. Next, the ALJ catalogued plaintiff's daily activities as reported at the hearings and in the Adult Function Report she submitted (AR 367-71), noting that some required the same abilities necessary for maintaining employment and were inconsistent with a debilitating condition. Id. The ALJ further noted that plaintiff did not indicate that she needed assistance performing these daily activities after having a seizure and while her boyfriend was away. Id. The ALJ therefore found her statements concerning the intensity, persistence, and limiting effects of her symptoms not entirely consistent with the medical and other evidence of record. Id.

### 4. Analysis

The ALJ's credibility assessment here was proper. First, the ALJ properly considered the inconsistency between plaintiff's testimony about her seizure frequency and the frequency reflected in her seizure log. Plaintiff's seizure log does not support her testimony that she had seizures at least every 14 days going back to 2013. AR 424-25, 429-32, 438-39 (showing 1 or 0 grand mal seizures noted in April–May 2014, Sept–Dec 2014, and June–July 2015). Plaintiff's inconsistent frequency reports are a clear and convincing reason to find her testimony not entirely credible. Second, the ALJ properly discounted plaintiff's testimony due to lack of record support for her claim that it sometimes took her "a couple of weeks" to fully recover from a seizure. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) (although lack of medical evidence cannot form the sole basis for discounting a plaintiff's testimony, it is a factor that can be considered). While it is unclear precisely what threshold would qualify as plaintiff regaining her "mental facilities," the court agrees with the ALJ that the only objective record evidence of plaintiff's recovery time—the normal physical exam results recorded on the four above described same-day post-seizure medical visits—contradicts a weeks-long, or even days-long recovery period. In a

similar vein, the ALJ's observation that there is no documentation that plaintiff's cognitive function has diminished constitutes a convincing reason to discount her stated reason for being unable to return to full-time employment. Finally, plaintiff's reported ability to independently navigate public transportation, manage her finances, do puzzles, and organize her house somewhat undercut her assertion that her seizure condition is incapacitating. See Morgan v. Comm'r, 169 F.3d 595, 599-600 (9th Cir. 1999) (conflicts between a claimant's testimony and her activities of daily living may constitute clear and convincing reasons for rejecting the testimony).

The ALJ provided several clear reasons, supported by the record, for his assessment of plaintiff's credibility. Accordingly, there was no legal error.

## VII.  CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (ECF No. 17), is DENIED;

2. The Commissioner's cross-motion for summary judgment (ECF No. 20), is GRANTED; and

3. The Clerk of the Court shall enter judgment for defendant, and close this case.

DATED: July 30, 2019

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

22